UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

                Plaintiff,                               Civil Case No. 19-11911
                                                      Honorable Linda V. Parker

v.

PROCTOR FINANCIAL, INC.,

                Defendant.
_____/

## OPINION AND ORDER DENYING THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

In this civil rights lawsuit filed on June 27, 2019, the Equal Employment Opportunity Commission ("EEOC") alleges that Defendant Proctor Financial, Inc. retaliated against its former employee, Angela Kellogg, in violation of Title VII of the Civil Rights Act of 1964. Specifically, the EEOC alleges that Proctor Financial disciplined Kellogg after she filed an EEOC charge alleging race discrimination. The matter is presently before the Court on the parties' cross-motions for summary judgment. (ECF No. 39, 40.) The motions have been fully briefed. Finding the facts and legal issues adequately presented in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(h). Because the Court finds genuine issues of material fact with respect to the EEOC's claim, it is denying the parties' motions.

## I.   Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the

2

non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *Liberty Lobby*, 477 U.S. at 255 (citation omitted).

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

## II.   Factual Background

Proctor Financial, a wholly owned subsidiary of Brown & Brown, Inc., is a lender-placed insurance company providing mortgage-insurance products to lending institutions. Proctor Financial hired Kellogg on August 11, 2008. (Kellogg Dep. at 59, ECF No. 40-2 at Pg ID 799.) On April 15, 2013, Kellogg was promoted to the position of Claims Examiner in Proctor Financial's Lender Services division. (*Id.* at 107, Pg ID 810.)

According to Kellogg's supervisors, she performed well as a Claims Examiner. In her first annual review as a Claims Examiner, Kellogg's then-supervisor, Laurie Wilkins, rated Kellogg as "Exceeds Expectations" in all areas and wrote: "Angela is a wonderful asset to the claims department. She is always positive, open, and a welcome addition to the department by all team members." (Pl. Mot. Ex. O, ECF No. 39-16.) In a June 22, 2016 review, Jim Harris, who

3

replaced Wilkins as Kellogg's supervisor in January 2016, rated Kellogg as "Exceeds Expectations" or higher ("Exceptional Performance") in all but one area.[1]  (*Id.* Ex. P, ECF No. 39-17.)  Harris wrote, in part: "Angela is a well liked and respected member of the claims operation.  Since coming to the team she has worked hard to increase her knowledge of insurance claims and to maintain a good balance of quantity and quality of work performed.  Handles high volume workload environment in a calm and professional manner."  (*Id.*)  In the section of the review listing "Performance Expectations", Harris listed as "Goals and Objectives" for Kellogg: (1) "Handle more flood claims as CAT losses occur to gain confidence and knowledge of the flood policy" and (2) "Complete New York and California testing process over next few months[.]"  (*Id.*)

This testing requirement was instituted sometime in 2014 at the request of Zurich, one of Proctor Financial's top insurance carriers.  (Kellogg Dep. at 108, ECF No. 40-2 at Pg ID 811; Harris Dep. at 30-32, 56-57, ECF No. 40-3 at Pg ID 847-49, 850-51.)  Zurich wanted the Claims Examiners working on its files to be licensed in the States where claims could be adjudicated.  (*Id.*)  As Proctor Financial handles files in all 50 States, with most of its exposure in the Continental United States, it required Claims Examiners to be licensed in those 48 States.

---

[1] Harris rated Kellogg as "Meets Expectations" in the area of "Initiatives."  (Pl. Mot. Ex. P at 2, ECF No. 39-17 at Pg ID 754.)

4

(Cox. Decl. ¶ 3, ECF No. 40-5 at Pg ID 866.)  Wilkins communicated the

requirement to Proctor Financial's Claims Examiners in January 2015.  (Kellogg

Dep. at 122, ECF No. 40-2 at Pg ID 815; Def. Mot. Ex. 5, ECF No. 40-6 at Pg ID

871.)  Claims Examiners were informed that Proctor Financial would provide

study time and cover the costs of test materials and the exams.  (Def. Mot. Ex. 5,

ECF No. 40-6 at Pg ID 871.)

Kellogg took and passed the Michigan license exam in September 2015 and

the Texas license exam in November 2015.  (*Id.*)  On February 26, 2016, after

assuming the supervisor position, Harris sent an email to the Claims Examiners

advising them that Michael Cox, then Senior Vice President of Proctor Financial,

"would like [them] to have [their] exams done by August 1."  (Def. Mot. Ex. 7,

ECF No. 40-8 at Pg ID 875.)  According to Harris' email, as of that date, none of

the Claims Examiners had more than two tests left to take.  (*Id.*)  Kellogg still had

the New York and California exams.  (Kellogg Dep. at 113, 116, ECF No. 40-2 at

Pg ID 813, 814.)  Kellogg testified that Harris had been pressuring her to take the

New York exam since early 2016.  (*Id.* at 126, Pg ID 816.)  According to a July 11,

2016 email that Harris sent Lisa Golden, Proctor Financial's Human Resources

Manager, Harris verbally informed the Claims Examiners sometime around June 1

"that there would be some sort of discipline if things were not done on time."

(Def. Mot. Ex. 8, ECF No. 40-9 at Pg ID 878.)

Harris sent this July 11 email five days after Kellogg filed an EEOC Charge of Discrimination claiming that she was being denied promotions because of her race. (Pl. Mot. Ex. A, ECF No. 39-2.) It appears that Golden prepared Proctor Financial's response to Kellogg's EEOC charge,[2] which was signed by its chief executive officer at the time, Paul Glantz. (*See* Pl. Mot. Ex. B, ECF No. 39-3 at Pg ID 727; *Id.* Ex. N, ECF No. 39-15.) On August 3, 2016, Glantz sent an email to Golden in which he stated: "What a sad waste of time responding to such a specious claim! Thanks for holding your nose and handling this, Lisa." (Pl.'s Mot. Ex. B, ECF No. 39-3 at Pg ID 727.) Golden responded, "Thanks, I agree." (*Id.*)

Several emails were exchanged between Golden, Glantz, and sometimes other Proctor Financial employees beginning September 7, 2016, with the subject line: "Angela Kellogg Update." (Pl. Mot. Ex. C, ECF No. 39-4.) In the email string is a September 12 email in which Glantz wrote to Golden: "So she [Kellogg] cleaned out her desk but returned to work today, correct?" (*Id.* at Pg ID 728-29.) After Golden responded "Correct[,]" Glantz wrote, "Then apparently she has quit." (*Id.* at Pg ID 728.) Golden answered at 2:41 p.m.:

---

[2] Proctor Financial disputes the EEOC's assertion that Golden "responded to Kellogg's EEOC Charge." (Def. Reply Br. at 6, ECF No. 42 at Pg ID 1127.) However, the email exchange between Golden and Glantz clearly reflects that Golden prepared Proctor Financial's response, even if it was signed by Glantz.

6

> I think she is waiting to hear back from the EEOC, but
> plans on quitting.  I Informed Jim Harris and Mike Cox it
> is business as usual with her for the time being.
>
> Jim Harris did make an interesting point . . . On the north
> side, we will be moving a bunch of staff around while we
> reconfigure and move/add workstations, maybe Angela
> was preparing for that move and didn't want to burden us
> with her personal items.
>
> I think it is a bit of a stretch and wishful thinking, as I
> don't she is really that helpful.

(*Id.*)  Glantz responded:

> I think Jim is extraordinarily naïve and doesn't realize the
> toxicity of this individual.  (I'm concerned if he can be an
> effective manager given said characteristic.) Sport-
> f#cking your employer with baseless claims is not an act
> of benevolence or demonstrative of showing
> consideration toward others.

(*Id.*)  Mohamed Elewa[3] and Mike Cox were copied on this email and others in the

string.

At 3:22 p.m. on the same day, September 12, 2016, Elewa responded to

Glantz's email:

---

[3] It is unclear from the record what position Mohamed Elewa held during the
relevant period.  Proctor Financial indicates in one of its briefs that Elewa was its
Chief Operating Officer at the time.  (Def. Br. in Supp. of Mot. at 7, ECF No. 42 at
Pg ID 1128).  Cox testified, however, that Elewa was promoted to President and
Chief Operating Officer of Proctor Financial only when Cox became CEO, which
was July 2018.  (Cox Dep. at 23, 28-29.)  His position is not material to the parties'
motions, however.

> We haven't done anything wrong to Angela.  As a matter
> of fact we've made every arrangement possible to
> accommodate her.  I don't think we should manage this
> on her terms. [language redacted] I would like to think
> and hope that falsely accusing us of these things doesn't
> stop us from deciding what's best for the company.

(Pl. Mot. Ex. D, ECF No. 39-5.)  Elewa's email also went to Golden and Cox.

Glantz wrote back at 4:24 p.m., also copying Golden and Cox:

> I disagree.  I think we should wait this out, see what the
> EEOC says, and slow play our hand.  There is no
> substantial upside to brooming her immediately. (It will
> be perceived as retaliatory.)  However, I think Jim needs
> to wake up in his dealings with her.

(*Id.*)

Golden also responded to Elewa's email.  (*Id*. Ex. E, ECF No. 39-6 at Pg ID

731.)  At 4:07 p.m. on September 12, Golden wrote:

> There is also the factor that she is not yet licensed in NY
> or CA.  She is only licensed in MI & TX.
>
> For her position, she needs to be licensed in all 4 states
> and even though she is working towards her licensing,
> she is having a hard time passing the exams.
>
> Per Angela, she stated that she will take her NY license
> exam September 9th or 10th, and she will schedule the
> California license exam for October 21st or 22nd. This
> may be an opportunity for us to discipline if she does not
> pass.  We have to be extremely patient and financially
> helpful in her obtaining these requirements.  There are
> other staff who are not fully licensed, however, they are
> working towards the licensing and have been more
> successful in a shorter period of time, comparatively.

8

That being said, [language redacted].

(*Id*.)  At 8:27 p.m., Glantz responded: "Once she is the only one that isn't licensed, it will be a lot easier.  Let's bide our time. . . ."  (*Id*.)  At 8:50 p.m. Cox sent an email to Glantz, Elewa, and Golden, which said: "Both Lisa and I have spoken with Jim on this approach.  I believe he gets it."  (*Id*.)

In the meantime, Kellogg informed Harris on April 18 that she would take the New York licensing exam by May 31, but she did not take the exam until July 11.  (Def. Mot. Ex. 13, ECF No. 40-14.)  Kellogg failed the exam on that date.  (Kellogg Dep. at 133, ECF No. 40-2 at Pg ID 819.)  On August 1, Kellogg told Harris she would sit for the exam again on August 19.  (Def. Mot. Ex. 14 at 2-3, ECF No. 40-15 at Pg ID 904-05.)  When Harris inquired about the time of the test a few days prior to August 19, Kellogg indicated that she had delayed signing up because "[m]ake-up tests are an out-of-pocket expense to me and that is why [she] wanted to be 100% ready and she also did not have the money to pay for the test due to several unexpected personal expenses (broken AC unit and replacement of her washer, dryer, and a car tire).  (*Id.*)  Kellogg indicated that she looked online and there actually was not a test on August 19 but she planned to take the one offered on the 27th.  (*Id.*)

In response to the financial concerns raised by Kellogg, Proctor Financial offered to advance her funds for the practice exam and exam fees.  (*Id.* Ex. 15, ECF No. 40-16 at Pg ID 908.)  In an August 30 email, Kellogg accepted the offer and indicated that she planned to schedule the New York test for September 9 or 10 and the California test for October 21 or 22.  (*Id.* at Pg ID 907.)

On September 13, Golden sent Harris an email inquiring, in part, as to whether Kellogg had taken the New York exam on September 9 or 10.  (*Id.* Ex. 16, ECF No. 40-17.)  When Harris responded that Kellogg had not mentioned the exam, Golden asked him to "reach out to her using her last email regarding her plan for licensing."  (*Id.*)  Golden offered to help Harris with the wording of the email and then continued: "We need to make sure that she follows her plan just as we are ensuring everyone else is following their plan as well."  (*Id.*)

Harris emailed Kellogg the following day, indicating that he was "following up on the NY licensing exam efforts" and requesting an update.  (*Id.* Ex. 17, ECF No. 40-18.)  Harris also offered to meet with Harris at the end of each workday to practice for the tests.  (*Id.*)  Kellogg responded about 20 minutes later:

> It's funny you asked, because I have a meeting with HR
> at 3:30 pm to discuss this.  Unfortunately, I have a
> serious health concern and I am meeting with HR to
> discuss further.  I also have an emergency doctor
> appointment tomorrow morning at 8:30 am.  I honestly
> can't commit to anything until I speak with HR and my
> doctor.  Can I please respond tomorrow? Please advise.

(*Id.*)  Kellogg in fact did not sit for the test on September 9 or 10.  (Kellogg Dep. at 144-45, ECF No. 40-2 at Pg ID 820-21.)

Kellogg eventually scheduled the New York test for the morning of Monday October 24.  (Def. Mot. Ex. 19, ECF No. 40-20.)  On that date, however, Kellogg texted Harris to let him know she would be at work on time because she had to reschedule the test.  (*Id.* Ex. 20, ECF No. 40-21.)  Kellogg explained that she had been in and out of the hospital all weekend because her daughters were sick, and she was in no shape to take the test.  (*Id.*)  Kellogg indicated that she would reschedule the test for the earliest date she could get.  (*Id.* Ex. 20, ECF No. 40-21.)  Harris copied Kellogg's text in an email to Golden later that day.  (*Id.*)

At 11:03 a.m. on October 24, Kellogg emailed Harris to inform him that she had rescheduled the test for November 7.  (*Id.* Ex. 21, ECF No. 40-22.)  Harris responded, asking if that was the earliest date she could retake it.  (*Id.*)  Kellogg answered that it was because her niece was getting married over the coming weekend.  (*Id.*)  Harris emailed Kellogg back and indicated that he did not "think that is acceptable in this situation."  (*Id.*)  Harris told Kellogg that he pulled up the test information and an exam was available on Thursday.  (*Id.*)  He told Kellogg to take her lunch hour to study and request a few hours of unpaid time off each day for the next few days to prepare.  (*Id.*)  Kellogg apparently told Harris that she

11

would reschedule the test for Thursday.  (*Id.*)  Harris forwarded this information to Cox and Golden.  (*Id.*)

Kellogg retook the New York exam the morning of October 27 but failed. When she returned to the office that day, Harris inquired about the results.  (Harris Dep. at 77, ECF No. 40-3 at Pg ID 852.)  During his deposition, Harris testified that he did not routinely ask Claims Examiners for their test scores, but he asked Kellogg because he wanted to confirm that she took the test.[4]  (*Id.* at 86, Pg ID 855.)  Kellogg told Harris that she "missed it by one or two points."  (*Id.* at 77, Pg ID 852)  At his deposition, Harris thought Kellogg told him she got a 68 on the exam.  (*Id.* at 78, Pg ID 853.)

The following day, Harris asked Kellogg for a copy of her exam results. (*Id.*)  Kellogg indicated that she did not have a copy because the printer at the center was broken.  (*Id.*)  Harris asked Kellogg to walk over to the center during lunch and ask for a copy of the results.  (*Id.*)  About 20 minutes later, as Harris was

---

[4] Proctor Financial offers evidence to try and create a genuine issue of material fact as to whether other Claims Examiners were asked for their licensing exam results when they failed.  (*See* Def. Resp. Br. at 2-3, ECF No. 42 at Pg ID 1123-24.)  This evidence, however, refers to employees submitting their *successful* results to satisfy the licensing requirements.  (*See, e.g.*, Harris Dep. at 71, 73, Cox Decl. ¶ 6, ECF No. 41 at Pg ID 1098; Watts Dep. at 15, 24, ECF No. 42-4 at Pg ID 1156; ECF No. 41 at Pg ID 1115.)  Proctor Financial offers no evidence of Claims Examiners otherwise being asked for exam results, such as when they failed an exam.

walking by the printing area in Proctor Financial's offices, someone handed him a piece of paper and said it looked important and that Kellogg might want it.  (*Id*.)  It was a print out of Kellogg's test results and Harris testified that it looked like Kellogg was in the process of marking up the document to hide her overall score of 59%, which was substantially lower than she reported to Harris.  (*Id*.)  Shortly after receiving a copy of the marked-up score report, Harris received an email from Kellogg with a copy of the results with the scores blocked out.  (*Id.* Ex. 11 at 2, ECF No. 40-12 at Pg ID 895.)

Harris testified that at that point he decided to discipline Kellogg because her low score reflected that she was not making an effort to study and, mainly, because she had misled him about her score.  (Harris Dep. at 79, ECF No. 40-3 at Pg ID 854.)  After consulting with Cox and Golden (*id.*), Harris issued Kellogg a Disciplinary Action Form, signed on November 6, 2016, which set forth a three-day suspension on November 8, 11 and 15, and a requirement that she re-take and pass the New York exam by November 16 and the California exam by February 16, 2018 (Def. Mot. Ex. 11, ECF No. 40-12).  Harris and Cox met with Kellogg on November 7 to present the discipline.  (Kellogg Dep. at 179, ECF No. 40-2 at Pg ID 827.)

The day before, Glantz had emailed Cox asking for an update regarding Kellogg.  (Pl. Mot. Ex. H, ECF No. 39-9.)  Cox wrote back the following day:

13

> Angela recently failed another state of NY exam.  She
> informed Jim Harris that she scored 68%, when we asked
> for a copy of the results we caught her in 2 lies.  Jim and
> I thought that the failure of the exam and the lying was
> grounds for termination.  However Brown & Brown HR
> disagree saying it may be perceived as retaliation for the
> EEOC filing . . .
>
> We are proceeding with discipline for the failure of the
> exam and lying. . . .

(*Id.*)  On November 14, during Kellogg's three-day suspension, Golden sent an

email to Brian Pinalla in Brown & Brown's human resources department, asking to

talk that day or the following day regarding Kellogg and indicating: "I spoke with

Mohammed, Jim and Mike and we're all on the same page we [sic] just like to end

her employment."  (*Id.* Ex. K, ECF No. 39-12.)  In her email, Golden expressed

that they did not want to wait longer than the end of the week or early the next

week to do so.  (*Id.*)

On November 17, following her three-day suspension, Kellogg voluntarily

resigned her position effective December 2.  (Def. Mot. Ex. 27, ECF No. 40-28.)

Proctor Financial agreed to pay Kellogg to December 2 but terminated the

relationship immediately.  (Pl. Mot. Ex. T, ECF No. 39-21.)

14

### III. Whether the EEOC or Proctor Financial are Entitled to Summary Judgment on the EEOC's Title VII Retaliation Claim

#### A. Applicable Law for Establishing a Title VII Retaliation Claim

Title VII prohibits discrimination against an employee because that employee engaged in conduct protected by the statute. *See* 42 U.S.C. § 2000e-3(a); *see also Laster v. City of Kalamazoo*, 746 F.3d 714, 729-30 (6th Cir. 2014) (explaining that Title VII's opposition clause protects individuals who file "formal discrimination charges with the EEOC," as well as individuals who submit "complaints to management" and engage in "less formal protests of discriminatory employment practices"). Title VII retaliation claims can be established "either by introducing direct evidence of retaliation or by offering circumstantial evidence that would support an inference of retaliation." *Laster*, 746 F.3d at 730 (quoting *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 538 (6th Cir. 2008)).

"Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." *Imwalle*, 515 F.3d at 543-44 (citing *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003)). "If there is direct evidence of retaliation, then 'the plaintiff's case-in-chief is met, and the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive.'" *Yazdian v. ConMed Endoscopic Tech., Inc.*, 793 F.3d

15

634, 648 (6th Cir. 2015) (quoting *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346-47 (6th Cir. 2012) (alterations in *Yazdian*)).

Absent direct evidence of retaliation, the plaintiff must establish a prima facie case of retaliation by showing: (1) she engaged in protected activity (2) that was known to the defendant, (3) the defendant thereafter took an adverse employment action against the plaintiff, and (4) a causal connection exists between the protected activity and adverse employment action.  *Imwalle*, 515 F.3d at 544  If the plaintiff demonstrates his or her case-in-chief through direct or circumstantial evidence, the burden shifts to the employer to demonstrate a legitimate non-retaliatory reason for its actions.  *Id*.; *Yazdian*, 793 F.3d at 648.  The plaintiff must then show that the legitimate reason offered is a pretext for retaliation and "that the real reason for the employer's action was intentional retaliation."  *Id*.

The Sixth Circuit Court of Appeals has identified three ways in which a plaintiff may establish pretext.  "The plaintiff may show that (1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action."  *Id*.

## B.    Direct Evidence

Contrary to Proctor Financial's contention, the emails circulated after Kellogg filed her initial EEOC Charge of Discrimination provide direct evidence

16

of retaliation.  In response to Kellogg's claims in the charge, which Proctor

Financial's then-CEO described as "specious," "baseless," and required "holding

your nose" to handle, a discussion ensued essentially about how to get rid of

Kellogg.  While it was expressed that Proctor Financial should "slow play [its]

hand" and not "broom[] her immediately," the emails reflect a clear intent to

terminate or at least take some adverse employment action against Kellogg in

response to her protected activity.  The emails throughout Fall 2016 reflect a plan

to wait for the opportunity to terminate or at least discipline Kellogg—specifically,

the results of Kellogg's attempts to complete the State licensing requirements.  No

inferences or presumptions are required.

Proctor Financial asserts that the emails do not provide direct evidence of

retaliation because neither Glantz nor Golden decided to suspend Kellogg, rather

Harris made the decision.  A reasonable juror could not agree.  The emails reflect

that Glantz and Golden made it clear to Harris what the plan of action would be,

even though Harris, as Kellogg's supervisor, was the one who had to execute the

adverse action.  Cox told Glantz that Cox and Golden had "spoken with Jim

[Harris] on his approach" regarding Kellogg.  Unlike *Rowan v. Lockheed Martin*

*Energy Systems*, 360 F.3d 544 (6th Cir. 2004), the individuals here who expressed

a clear retaliatory intent played a role in Kellogg being suspended.  They

orchestrated the play.  *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d

17

344, 355 (6th Cir. 1989) (explaining that a person can be "meaningfully involved" in an adverse decision when a "reasonable jury could conclude that [the individual] was in a position to influence the alleged decision").

Proctor Financial also claims the emails "are far too attenuated to the suspension decision to constitute direct evidence of retaliation." (Def. Resp. Br. at 11, ECF No. 42 at Pg ID 1132.) Proctor Financial points out that Golden's statement that the results of Kellogg's September 9 or 10 exam attempts "may be an opportunity for us to discipline her" were made two months before any decision was made to suspend her. However, the fact that the "opportunity" took longer than expected to arise does not undermine the retaliatory motive expressed.

## C.   Circumstantial Evidence

But even if direct evidence is lacking, the EEOC can make out a prima facie case of retaliation. Proctor Financial challenges only the EEOC's ability to satisfy the fourth prong—that is, a causal connection between the protected activity and adverse employment action. Proctor Financial notes the four-month gap between Kellogg's EEOC filing and her suspension and argues that intervening causes— i.e., Kellogg's failing the New York exam and attempts to conceal the results— defeat any inference of retaliation.

The emails, however, provide an undisputable causal connection between Kellogg's protected activity and her suspension. In addition to communications

18

criticizing her EEOC charge, which began within a month of its filing, emails were

exchanged in early September—within two months of Kellogg's protected

activity—at the very least suggesting a plan to take adverse action against her.

While the "opportunity" to execute this scheme did not arise until four months

after Kellogg's EEOC filing, this timing is not too attenuated particularly

considering the other evidence of a retaliatory motive. *See Mickey v. Zeidler Tool*

*& Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (citing *Little v. BP Expl. & Oil Co.*,

266 F.3d 357, 365 (6th Cir. 2001) ("[T]emporal proximity, when considered with

the other evidence of retaliatory conduct, is sufficient to create a genuine issue of

material fact as to a causal connection.").

Coupled with the emails is the fact that Harris rated Kellogg highly on her

annual review only a few months earlier, before she filed her EEOC charge, even

though she had not yet satisfied the licensing requirements. Further, there is no

evidence of Proctor Financial asking any other Claims Examiner for the results of a

*failed* exam before Harris requested a copy of Kellogg's New York results.

A reasonable jury might find that Kellogg's response to Harris' request—

i.e., inaccurately reporting her overall score and providing a doctored copy of the

results—provided "an intervening legitimate reason" to suspend her. *See Kuhn v.*

*Washtenaw Cnty.*, 709 F.3d 612, 628 (6th Cir. 2013) (quoting *Wasek v. Arrow*

*Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012)). On the other hand, a jury

also could reasonably find that Kellogg's actions and statements were not an intervening cause but the "opportunity" for which Glantz, Golden, and at least Cox were waiting to justify an adverse employment action against her.

### D.  Legitimate, Non-Retaliatory Reason

To summarize, the Court finds direct evidence that Kellogg's protected activity motivated Proctor Financial to take adverse action against her or, at least, the EEOC has shown a causal connection between Kellogg's EEOC filing and her suspension.  Proctor Financial nevertheless maintains that "it suspended Kellogg because of her continued resistance to adhering to the Company's licensing requirements and the lack of integrity displayed by her misleading actions and statements related to the New York licensing exam."  (Def. Br. in Supp. of Mot. at 15, ECF No. 40 at Pg ID 784.)  This is a legitimate, non-retaliatory reason to support the adverse employment action against Kellogg.  Thus, the Court turns to the issue of pretext.  *See Yazdian*, 793 F.3d at 648, 650 (explaining that whether the plaintiff meets his or her case-in-chief through direct or circumstantial evidence, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for its actions, and then to the plaintiff to demonstrate pretext)

20

**D.    Pretext**

For the reasons discussed below, the Court concludes that the EEOC

presents evidence to create a genuine issue of material fact as to whether Proctor

Financial's reason for suspending Kellogg was a pretext for unlawful retaliation.

First, as discussed above, for over a year and a half, the licensing

requirement was in place, with Kellogg not completing the New York or California

exam.  Yet, Proctor Financial took no action against Kellogg or any other Claims

Examiner who had not passed all the required exams during that time.  It was only

after Kellogg's protected activity that Proctor Financial decided that she was not

taking the requirement "seriously" and that this was a reason to suspend her.  As

also discussed above, a few months before Kellogg's suspension but before she

filed her EEOC charge, Harris rated Kellogg as "Exceeds Expectations" and

"Exceptional Performance" (*see* Pl. Mot. Ex. P, ECF No. 39-17), even though

Kellogg had not passed the two exams and her "actions [we]re not those of an

individual who [wa]s taking the requirement to be licensed seriously" (Def. Mot.

Ex. 11 at 2, ECF No. 40-12 at Pg ID 895).  This suggests that Kellogg's claimed

procrastination in satisfying the licensing requirement was insufficient to motivate

and did not motivate the adverse employment action against her.

Second, Claims Examiners previously failed licensing exams without

reprisal or a demand to see the results.  (Buck Dep. at 14, 16, 18, ECF No. 39-13 at

21

Pg ID 741-42; Watts Dep. at 17, ECF No. 39-14 at Pg ID 743.)  Notably, Claims

Examiner Deanna Buck had not passed three Continental United States licensing

exams by mid-2016 (*see* Buck Dep. at 14, ECF No. 39-13 at Pg ID 741)—the point

at which Proctor Financial apparently felt was too long for Kellogg to wait to

satisfy the licensing requirement.  Those examiners were not asked to submit their

failed test results.  (Buck Dep. at 16, 18, ECF No. 39-13 at Pg ID 741-42; Harris

Dep. at 86, ECF No. 39-18 at Pg ID 758; Cox Dep. at 99, ECF No. 39-19 at Pg ID

759.)

The Court acknowledges the dissimilarities Proctor Financial identifies

between Kellogg and these other Claims Examiners.  (*See, e.g.*, Def. Resp. Br. at

20-21, ECF No. 42 at Pg ID 1141-42.)  This includes the fact that, unlike these

other Claims Examiners, Kellogg misled Harris when he inquired about her results

on the New York exam.  Nevertheless, even with these distinctions, a reasonable

jury could find that Proctor Financial's reasons for suspending Kellogg were

pretextual.  This is particularly so because of the email exchanges that preceded the

adverse employment action which manifest a scheme to find "an opportunity" to

discipline her.  The Sixth Circuit has "held that when an 'employer waits for a

legal, legitimate reason to fortuitously materialize, then uses it to cover up his true,

longstanding motivations for [taking an adverse employment action against] the

employee,' the employer's actions constitute 'the very definition of pretext.'"

22

*Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 436 (6th Cir. 2009) (ellipsis removed) (quoting *Jones v. Potter*, 488 F.3d 397, 408 (6th Cir. 2007)).

While the Court finds the evidence of retaliation to be strong, it nonetheless sees a genuine issue of material fact as to whether the reason offered by Proctor Financial for Kellogg's discipline is pretextual. Accordingly, this issue must be resolved by the finder of fact. For these reasons, the Court holds that neither party is entitled to summary judgment on Kellogg's retaliation claim.

## IV.   Damages

Proctor Financial seeks summary judgment on two issues regarding damages. First, Proctor Financial argues that the "after-acquired evidence defense" bars Kellogg's potential economic damages after November 19, 2019. Second, Proctor Financial argues that Kellogg is not entitled to non-economic damages.

### A.    After-Acquired Evidence Defense

The after-acquired evidence defense limits an employee's remedies where an employer can show it would have been entitled to terminate the employee for severe wrongdoing if it had known of the employee's wrongdoing at the time. *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 362-63 (1995). The employer must show "that the wrongdoing was of such severity that the employee in fact would have been terminated *on those grounds alone* if the employer had

23

known of it at the time of the discharge." *Id.* (emphasis added).  Generally, the

defense bars employees from obtaining front pay and reinstatement, and backpay is

limited.  *Id*. at 361-62.  For backpay, "[t]he beginning point in the trial court's

formulation of a remedy should be calculation of backpay from the date of the

unlawful discharge to the date the new information was discovered" and "the court

can consider taking into further account extraordinary equitable circumstances that

affect the legitimate interests of either party."  *Id*. at 362.

To support the application of the defense in this case, Proctor Financial

relies on Kellogg's omission of certain prior employers and inaccuracies in the

dates of her prior employment or reasons for her employment separation on her

employment application.  (Def. Br. in Supp. of Mot. at 21-22, ECF No. 40 at Pg ID

790-91.)  Cox states in a declaration that Proctor Financial considers the

"[f]alsification of employment records, including applications and resumes

submitted by applicants for employment . . . a terminable offense."  (Cox Decl.

¶ 10, ECF No. 40-5 at Pg ID 868.)  Cox further states that if Proctor Financial had

known about the information Kellogg misrepresented or omitted from her

application, it would not have hired her or would have terminated her upon

discovering the information.  (*Id*.)

The EEOC argues in response that the after-acquired evidence defense is

inapplicable to this case involving a suspension and where on-going back pay

24

damages, front pay, and reinstatement are not sought. (Pl. Resp. Br. at 18, ECF No. 43 at Pg ID 1280.) The EEOC cites one district court case where the defense was found inapplicable for the same reasons: *Wilson v. K.T.G. (USA), Inc.*, No. 16-cv-02508-TMP, 2018 U.S. Dist. LEXIS 225849, at \*6 (W.D. Tenn. Nov. 21, 2018). This Court found one more: *Wallace Sales & Consulting, LLC v. Tuopu NA, Ltd.*, No. 2:15-cv-10748, 2016 WL 6563439, at \*2 (E.D. Mich. Nov. 4, 2016).

Proctor Financial does not respond to the EEOC's argument in reply. The Court therefore presumes that it concedes that its argument is not relevant here.

### B.    Non-Economic Damages

Proctor Financial argues that Kellogg is not entitled to emotional distress damages because there is a "lack of competent evidence to support any such award." (Def. Br. in Supp. of Mot. at 22, ECF No. 40 at Pg ID 791.) Proctor Financial maintains that emotional distress damages are barred absent evidence "that Kellogg treated with a physician, therapist, or counselor for any alleged emotional distress arising out of her November 2016 three-day suspension." (*Id.* at 23, Pg ID 792.)

The Sixth Circuit has advised that "medical evidence is not necessary in order for a plaintiff to be compensated for emotional distress." *Betts v. Costco Wholesale Corp.*, 558 F.3d 461, 472 (2009). Nevertheless, "damages for mental and emotional distress will not be presumed, and must be proven by 'competent

evidence.'"  *Id*. (quoting *Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1215 (6th Cir.

1996) (quoting *Carey v. Piphus*, 435 U.S. 247, 263-64 n.20 (1978))).  "A

plaintiff's own testimony, along with the circumstances of a particular case, can

suffice to sustain the plaintiff's burden in this regard."  *Barrow v. City of

Cleveland*, 773 F. App'x 254, 265 (6th Cir. 2019) (quoting *Moorer v. Baptist

Mem'l Health Care Sys.*, 398 F.3d 469, 485 (6th Cir. 2005)); *see also Moore v.

KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1082 (6th Cir. 1999).

In *Barrow*, the Sixth Circuit found sufficient evidence to support the jury's

award of damages for emotional distress where the plaintiff, "when asked at trial

what adverse impact the Defendants' conduct had on his physical and mental

health," answered "that he 'really only sleeps about maybe two hours a night.  Just

happened to be always on edge, … [and] had to see the police psychiatrist a

number of months . . .."  773 F. App'x at 265.  In *Moore*, the Sixth Circuit upheld

the jury's $50,000 noneconomic-damage award to a Title VII plaintiff where the

"plaintiff testified that he was injured because he was 'angry' and 'upset' about the

[racist] jokes and slurs and that he 'just couldn't take it any more.'"  171 F.3d at

1082.  The court held that the plaintiff's testimony "sufficiently demonstrates the

requisite injury to support compensatory damages."  *Id*.

The EEOC has sought emotional distress damages on behalf of Kellogg.

(*See* Compl. at 6, ECF No. 1 at Pg ID 7.)  When asked during her deposition what

symptoms of emotional distress she has experienced, Kellogg answered: "I just – I don't feel like I'm the same that I used to be.  I'm not the happy person I used to be."  (Kellogg Dep. at 226, ECF No. 40-2 at Pg ID 837.)  When asked about physical symptoms, Kellogg mentioned recent problems with her kidneys and high cholesterol that "came into play[.]"  (*Id*.)  Kellogg indicated that she began seeking a psychiatrist "for a while" in around 2017, but had to stop going because it was expensive and the doctor was far.  (*Id*. at 228-29, Pg ID 839-40.)  Before then, Kellogg's general doctor diagnosed her with depression and prescribed medication for her condition.  (*Id*. at 230, Pg ID 841.)  This evidence warrants the presentation to a jury of whether Kellogg is entitled to emotional distress damages.

## V.    Conclusion

For the reasons set forth above, the Court concludes that neither the EEOC nor Proctor Financial are entitled to summary judgment on the issue of whether Proctor Financial unlawfully retaliated against Kellogg in violation of Title VII. Based on the undisputed facts, a jury must decide whether Proctor Financial's stated reasons for suspending Kellogg were a pretext for unlawful retaliation. Proctor Financial is not entitled to summary judgment with respect to the damages issues raised in its motion.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment (ECF No. 39) and Defendant's Motion for Summary Judgment (ECF No. 40) are **DENIED**.

**IT IS SO ORDERED.**

s/ Linda V. Parker\
LINDA  V. PARKER\
U.S. DISTRICT JUDGE

Dated: September 30, 2021